# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of: ANTOINETTE
DUMONT,

                  *Debtor,*

---

ANTOINETTE DUMONT,

                  *Appellant,*

v.

FORD MOTOR CREDIT COMPANY,

                  *Appellee.*

No. 08-60002

BAP No.
SC-07-1155-BaMoD

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Baum, Montali, and Dunn, Bankruptcy Judges

Argued and Submitted
May 5, 2009—Pasadena, California

Filed September 15, 2009

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Susan P. Graber, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Graber

13405

## COUNSEL

Michael G. Doan, Doan Law Firm, Carlsbad, California, argued the cause for appellant-debtor and filed briefs.

Randall P. Mrocynski, Cooksey Toolen Gage Duffy & Woog, Costa Mesa, California, argued the cause for the appellee and submitted a brief.

Tara Twomey, National Association of Consumer Bankruptcy Attorneys, San Jose, California, submitted a brief on behalf of amicus curiae National Association of Consumer Bankruptcy Attorneys. With her on the brief was Cynthia Feathers.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 allows a consumer in bankruptcy to retain personal property subject to a security interest by continuing to make payments under his contract.

I

Antoinette Dumont purchased a car in 2003 from Ford Motor Credit Company ("Ford"). The loan agreement contained a clause stating that Dumont would be in default if she was involved in a bankruptcy proceeding, also known as an "ipso facto" clause.[1] Dumont filed for Chapter 7 bankruptcy protection in 2006, subsequent to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23. The vehicle was listed on the bankruptcy petition as having a value of $5,800. At the time, she owed $8,288 on it and was making payments of $335.78 per month. In her Bankruptcy

---

[1]The contract read: "Default means . . . [y]ou start a proceeding in bankruptcy or one is started against you or your property." It further states that "[i]f you default, we may take (repossess) the vehicle from you if we do so peacefully."

Statement of Intentions, Dumont stated that she would retain the car and continue to make monthly payments.

Ford's attorney e-mailed Dumont's attorney, asking that Dumont reaffirm the debt. Her attorney declined the offer. It is not clear from the record what the terms of the proposed reaffirmation were.

Ford filed a proof of claim, to which there was no objection; thus Ford's claim was allowed. *See* 11 U.S.C. § 502(a). Dumont received a discharge on August 15, 2006. After the discharge, she continued making payments on the car loan. Without advance notice, Ford repossessed her car on November 14, 2006.

Dumont successfully moved to reopen her bankruptcy case and claimed that Ford had violated the discharge injunction by repossessing her car. The bankruptcy court denied the motion to find Ford in violation of the discharge injunction, and the Bankruptcy Appellate Panel (BAP) unanimously affirmed.

## II

### A

**[1]** When a debtor files for Chapter 7 bankruptcy, she is required to state her intentions with regard to any property[2]

---

[2]In this case, the property was owned by an individual debtor and was used for personal rather than business purposes. The bankruptcy laws often treat individuals differently from other entities which may file for bankruptcy. *See, e.g.*, 11 U.S.C. § 521(a)(2) (applying only to "individual debtor[s]"). We also note that the property in dispute here was personal property, not real property. We accordingly have no need to determine whether debtors may retain their real property via ride-through. *See id.* § 362(h)(1) (referring to "personal property of the estate"); *In re Caraballo*, 386 B.R. 398, 402 (Bankr. D. Conn. 2008) ("Code § § 521(a)(6) and 362(h) abrogated the ride through option as it pertains to personal property. However, courts have concluded that the ability of a debtor to choose the ride though option as it relates to real property was not abrogated by BAPCPA."). Our analysis may not necessarily hold where the debtor is not an individual or where real property is involved.

which is subject to a security interest. 11 U.S.C. § 521(a)(2). Prior to BAPCPA, our circuit law allowed the debtor to choose among four options. First, she could merely surrender the collateral. Second, she could redeem such collateral—that is, pay the creditor its present fair market value. *See id.* § 722. The debtor could also reaffirm the debt on terms she and the creditor agreed on. Reaffirmation allowed the debtor to keep her collateral, but re-exposed her to personal liability should she fail to make payments as promised. *See id.* § 524(c) (setting conditions for reaffirmations and exempting them from the discharge injunction). The final option—recognized in only some circuits—was the so-called "ride-through" or "pay and drive." Under this plan, the debtor continued to make payments as if the bankruptcy had never occurred. The creditor was forbidden by the automatic stay (and later, by the discharge injunction) from repossessing the collateral unless the buyer defaulted. If the buyer stopped making payments or otherwise defaulted, then the creditor could reclaim its collateral but could not pursue a deficiency judgment against the debtor.

Unsurprisingly, the ride-through system proved popular for debtors. Debtors usually need a car[3] to travel to and from work, school, medical appointments, and other important activities. Having just filed for bankruptcy, they understandably expect to experience difficulty securing financing for another vehicle. Accordingly, they were often willing to continue payments on loans that were "underwater" (i.e., loans for which the amount due exceeded the value of the collateral).

Some creditors embraced ride-through, even allowing the debtor to keep making payments in circuits which did not recognize the option. *See, e.g.*, Jean Braucher, Rash *and Ride-*

---

[3]Ride-through was not limited to automobile loans. However, as the name implies, ride-through was used most frequently to allow debtors to hold on to an automobile.

*Through Redux*, 13 Am. Bankr. Inst. L. Rev. 457, 474-81 (2005). On the other hand, creditors might believe that the buyer was unlikely to follow through with the plan or that the collateral might decrease in value faster than payments were coming in. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004) (plurality opinion) (acknowledging the increased risk of non-payment by bankrupt debtors in the Chapter 13 "cramdown" context); *id.* at 502 (Scalia, J., dissenting) (noting the risk due to depreciation).[4]

## B

**[2]** Prior to BAPCPA, we had held that ride-through was available to debtors. *McClellan Fed. Credit Union v. Parker* (*In re Parker*), 139 F.3d 668 (9th Cir. 1998). The Second, Third, Fourth, and Tenth Circuits held likewise.[5] Other circuits rejected ride-through.[6]

In *Parker*, we relied on the clear language of the statute,[7]

---

[4]The BAP expressed some confusion about Ford's decision to repossess given that Dumont was making payments. *In re Dumont*, 383 B.R. 481, 489 n.17 (BAP 9th Cir. 2008). We decline to speculate as to Ford's motivations in this case; we only note that a decision to repossess might make financial sense under certain sets of assumptions.

[5]*See Price v. Del. State Police Fed. Credit Union* (*In re Price*), 370 F.3d 362 (3d Cir. 2004); *Capital Commc'ns Fed. Credit Union v. Boodrow* (*In re Boodrow*), 126 F.3d 43 (2d Cir. 1997); *Home Owners Funding Corp. of Am. v. Belanger*, 962 F.2d 345 (4th Cir. 1992); *Lowry Fed. Credit Union v. West*, 882 F.2d 1543 (10th Cir. 1989).

[6]*See Bank of Boston v. Burr* (*In re Burr*), 160 F.3d 843 (1st Cir. 1998); *Johnson v. Sun Fin. Co.* (*In re Johnson*), 89 F.3d 249, 252 (5th Cir. 1996); *Taylor v. Age Fed. Credit Union* (*In re Taylor*), 3 F.3d 1512 (11th Cir. 1993); *In re Edwards*, 901 F.2d 1383 (7th Cir. 1990). The Sixth Circuit rejected a proposal similar to ride-through in *General Motors Acceptance Corp. v. Bell* (*In re Bell*), 700 F.2d 1053, 1056-58 (6th Cir. 1983). However, that decision predated the 1984 amendments to the Bankruptcy Code, which "include[d] the language that gave rise to the ride-through dispute." *Coastal Fed. Credit Union v. Hardiman*, 398 B.R. 161, 171 n.8 (E.D.N.C. 2008).

[7]At the time *Parker* was decided, the relevant statute, 11 U.S.C. § 521(2) read:

holding that the debtor was required only to file a statement of intention under then-current section 521(2)(A). We read the statute to require the debtor to declare an intent to redeem, reaffirm, or surrender only " 'if applicable,'—that is, if the debtor plan[ned] to choose any of the three options listed . . . in the statute." *Parker*, 139 F.3d at 673 (quoting then-current 11 U.S.C. § 521(2)(A)). "The debtor's other options remain[ed] available, as unambiguously stated in [then-current] § 521(2)(C): "[N]othing in subparagraph[ ](A) . . . shall alter the debtor's or the trustee's rights with regard to such property under this title." *Id.* (final two alterations in original).[8]

## C

**[3]** BAPCPA wrought several changes in the Code which

---

[I]f an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate[, the debtor shall] —

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title[.]

[8]Subparagraph (C) became known as the savings clause.

may be applicable to ride-through. First, it amended section 521(2), which is now section 521(a)(2). Most relevant for our purposes, the savings clause in subparagraph (C) now reads: "[N]othing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title, *except as provided in section 362(h)*." (emphasis added). 11 U.S.C. § 362(h), added by BAPCPA, states that the automatic stay is terminated and the "property shall no longer be property of the estate if the debtor fails"

> (A) to file timely any statement of intention required . . . or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem [,reaffirm,] or assume such unexpired lease pursuant to section 365(p)[9] if the trustee does not do so, as applicable; and
>
> (B) to take timely the action specified in such statement, . . . unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree . . . .

A new section 521(a)(6) was added as well.[10]

A new section 521(d) provides that

---

[9]Section 365(p) addresses the assumption of unexpired leases. Added by BAPCPA, it appears to have no relevance to this case.

[10]It read, in part: "[The debtor shall] not retain possession of personal property as to which a creditor has an allowed claim for the purchase price secured in whole or in part by an interest in such personal property unless the debtor [timely] either . . . [reaffirms] or . . . redeems such property . . . ." Later, it continues: "If the debtor fails to so act . . ., the stay under section 362(a) is terminated with respect to the . . . affected [property], such property shall no longer be property of the estate, and the creditor may take whatever action as to such property as is permitted by applicable nonbankruptcy law." *Id.* at § 521(a).

[i]f the debtor fails timely to take the action speci-
fied in [§ 521(a)(6) or § 362(h)(A) or (B)], with
respect to property . . . as to which a creditor holds
a security interest not otherwise voidable . . ., noth-
ing in this title shall prevent or limit the operation of
a provision in the underlying lease or agreement that
has the effect of placing the debtor in default under
such lease or agreement by reason of the occurrence,
pendency, or existence of a proceeding under this
title or the insolvency of the debtor. Nothing in this
subsection shall be deemed to justify limiting such a
provision in any other circumstance.

## D

BAPCPA has been criticized for its lack of clarity.[11] We
agree that BAPCPA is hardly the very model of a well-drafted
statute. However, it is our task to interpret the laws as passed
by Congress without attempting to force them to cohere more
than their words allow. *See Miller v. DaimlerChrysler Fin.
Servs. Ams., LLC* (*In re Miller*), 570 F.3d 633, 639 (5th Cir.
2009) ("[P]erceived poor drafting [in BAPCPA] should not be

---

[11]*See, e.g., In re Donald*, 343 B.R. 524, 529 (Bankr. E.D.N.C. 2006)
(stating with respect to ride-through: "Unfortunately, the BAPCPA
amendments do not provide a clear answer. The amendments are confus-
ing, overlapping, and sometimes self-contradictory. They introduce new
and undefined terms that resemble, but are different from, established
terms that are well understood. Furthermore, the new provisions address
some situations that are unlikely to arise. Deciphering this puzzle is like
trying to solve a Rubik's Cube that arrived with a manufacturer's
defect."); *In re Steinhaus*, 349 B.R. 694, 706 (Bankr. D. Idaho 2006) ("[I]t
appears unmistakable that Congress drafted, or allowed to be drafted by
others and then enacted, provisions with 'loose' and imprecise lan-
guage."); Keith Lundin, *Ten Principles of BAPCPA*, Am. Bankr. Inst. J.,
Sept. 2005, at 1, 1 ("The list of drafting errors and incomprehensible pro-
visions grows every day as bankruptcy professionals digest BAPCPA.
Especially the consumer parts, this legislation was not written or vetted by
the practitioners and scholars usually involved in bankruptcy legislative
efforts.").

regarded as a license to invalidate plain-text readings in the name of fixing a statute that some believe is broken.").

In doing so, we are guided by traditional canons of statutory interpretation. We first note the principle "that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Courts should decline to render any "express exception . . . insignificant, if not wholly superfluous." *Id.* (internal quotation marks omitted). However, according to the plain meaning rule, "where the language of an enactment is clear [or, in modern parlance, plain], and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). The scope and applicability of the absurdity exception to the plain meaning rule is a subject of vigorous debate.[12]

We further note that, in general, legislative history is not an able guide here. *See, e.g.*, *Parker*, 139 F.3d at 673 (noting that, in the ride-through context, "[t]he legislative history is of little assistance"); *Donald*, 343 B.R. at 532-33 (noting the sparse legislative history available for BAPCPA section 305). Nor do the purposes of the bankruptcy code provide much aid. Bankruptcy law serves two central but often conflicting interests. As Dumont rightly notes, bankruptcy law aims to protect the "honest but unfortunate debtor." *Local Loan Co v. Hunt*, 292 U.S. 234, 244 (1934). On the other hand, since ancient times, bankruptcy has also been seen as promoting

---

[12]*See, e.g.*, John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2486 (2003) (criticizing the absurdity doctrine as "entail[ing] the exercise of judicial authority to displace the outcomes of the legislative process"); Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 HARV. L. REV. 405, 440-41 (1989) (defending the use of "more aggressive" means "when conventional interpretation would produce absurdity or gross injustice").

creditor interests as well. *See United States v. Kras*, 409 U.S. 434, 447 (1973) (noting that discharge provisions developed in England as a reward for a cooperating debtors); Thomas H. Jackson, *The Fresh-Start Policy in Bankruptcy Law*, 98 HARV. L. REV. 1393, 1395 n.5 (1985) (recognizing "[t]he comparative newness of the fresh-start policy in bankruptcy law"). Because of the importance of secured lending to the nation's economy, secured creditors have been the subject of particular congressional solicitude. This policy can be seen in other provisions of BAPCPA, including one change which clearly reflects congressional concern for auto lenders.[13]

**[4]** Finally, we observe that congressional power over bankruptcy affairs is limited by the constitutional requirement that the bankruptcy laws be "uniform." U.S. CONST. art. I, § 8, cl. 4. This principle was explained in *Hanover National Bank v. Moyses*, 186 U.S. 181 (1902), which found constitutional a provision of the Bankruptcy Code which set exemptions by looking to state law. There, it held that "the system [was], in the constitutional sense, uniform throughout the United States, when the trustee takes in each state whatever would have been available to the creditor if the bankrupt law had not been passed. The general operation of the law [was] uniform although it [might] result in certain particulars differently in different states." *Id.* at 190. This is but an example of the principle that federal bankruptcy law generally leaves "the deter-

---

[13]Prior to BAPCPA, Chapter 13 debtors could "cramdown" car loans, bifurcating them into a secured portion equal to the present value of the automobile and an unsecured portion containing the remaining debt. "It seems to be undisputed that Congress viewed this use of 'cramdown' as abusive and unfair to car lenders and other lienholders, so it sought to" give extra protection to these secured lenders. *In re Dean*, 537 F.3d 1315, 1318 (11th Cir. 2008). BAPCPA did not alter Chapter 13 debtors' ability to surrender the collateral or renegotiate a deal with the creditor, but required them to make payments based on the full amount of the creditor's claim where the automobile had been purchased within 910 days of the bankruptcy and met certain other requirements. *See In re Jones*, 530 F.3d 1284, 1289 (10th Cir. 2008).

mination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979). It would raise serious constitutional questions for us to conclude that Congress affirmatively intended to promote the non-uniform system caused by the circuit split over ride-through. The Supreme Court has counseled us to avoid such conclusions "unless [the alternate] construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Given the amendment of section 521(a)(2) and the enactment of section 362(h), it is unlikely that Congress failed to foresee that BAPCPA would have a major impact on ride-through. Accordingly, we assume that Congress intended to make ride-through available in all circuits, or none. The direction and tenor of the changes, which place new duties on debtors and create new sanctions for failure to comply, suggest that Congress did not intend to increase access to ride-through by passing BAPCPA.

### III

### A

We must therefore decide whether our decision in *Parker* survived BAPCPA. The bankruptcy court held that it did not, and that accordingly Dumont had no right to ride-through. The Ninth Circuit Bankruptcy Appellate Panel unanimously agreed, following the lead of every bankruptcy court to have considered whether ride-through is still available to debtors, at least those who did not seek reaffirmation. *In re Dumont*, 383 B.R. 481 (BAP 9th Cir. 2008).[14]

(Text continued on page 13420)

---

[14]The BAP cited the following bankruptcy court decisions as supporting its conclusion: *In re Bower*, No. 07-60126-FRA7, 2007 WL 2163472 (Bankr. D. Or. July 26, 2007); *In re Moustafi*, 371 B.R. 434 (Bankr. D. Ariz. 2007); *In re Openshaw*, No. 06C-24120, 2007 WL 2916294 (Bankr. D. Utah Mar. 12, 2007); *In re Ertha Rice*, No. 06-10975, 2007 WL 781893 (Bankr. E.D. Pa. Mar.12, 2007); *In re Husain*, 364 B.R. 211

(Bankr. E.D. Va. 2007); *In re Blakeley*, 363 B.R. 225 (Bankr. D. Utah 2007); *In re McFall*, 356 B.R. 674 (Bankr. N.D. Ohio 2006); *In re Ruona*, 353 B.R. 688 (Bankr. D.N.M. 2006); *In re Riggs*, No. 06-60346, 2006 WL 2990218 (Bankr.W.D. Mo. Oct. 12, 2006); *In re Steinhaus*, 349 B.R. 694 (Bankr. D. Idaho 2006); *In re Anderson*, 348 B.R. 652 (Bankr. D. Del. 2006); *In re Norton*, 347 B.R. 291 (Bankr. E.D. Tenn. 2006); *In re Donald*, 343 B.R. 524 (Bankr. E.D.N.C. 2006); *In re Boring*, 346 B.R. 178 (Bankr. N.D. W. Va. 2006); *In re Rowe*, 342 B.R. 341 (Bankr. D. Kan. 2006); *In re Craker*, 337 B.R. 549 (Bankr. M.D.N.C. 2006). Several cases after the BAP's decision also have concluded that ride-through has been eliminated where there was no attempt at reaffirmation. *Fees v. Ford Motor Credit Co.*, No. CV07-389-S-EFL, 2008 WL 4630668 (D. Idaho Oct 17, 2008); *In re Baine*, 393 B.R. 561 (Bankr. S.D. Ohio 2008); *In re Jones*, 397 B.R. 775 (S.D. W. Va. 2008).

Dumont notes that some courts have allowed ride-through after BAP-CPA. However, in each of these cases, there was "substantial compliance with § 521(a)(2), § 521(a)(6), and § 362(h)." *Jones*, 397 B.R. at 788 (citing *In re Baker*, 390 B.R. 524 (Bankr. D. Del. 2008); *In re Chim*, 381 B.R. 191 (Bankr. D. Md. 2008); *Moustafi*, 371 B.R. at 434; *Husain*, 364 B.R. at 211; *Blakeley*, 363 B.R. at 225); *see also Hardiman*, 398 B.R. at 161. In each of these cases, the debtor submitted a reaffirmation agreement to the bankruptcy court, which rejected the agreement as not in compliance with 11 U.S.C. § 524(c) for reasons beyond the debtor's control. *See id.* § 524(c)(6)(A)(ii) (requiring the court to declare the reaffirmation agreement in the best interests of the debtor before approving it if the debtor is unrepresented); *id.* § 524(c)(3)(B) (requiring the attorney of a represented debtor to certify that the agreement "does not impose an undue hardship on the debtor or a dependent of the debtor" before it can be approved).

Here, it is undisputed that Dumont rejected an offer of reaffirmation. We need not address what might have been had Dumont attempted to reaffirm only to be rebuffed by either Ford or the bankruptcy court. We are aware that not addressing this scenario leaves the law of ride-through unclear, creating uncertainty for many Chapter 7 debtors and creditors alike. *See* Am. Bankr. Inst., Annual Non-Business Filings by Chapter (2007-08), http://www.abiworld.org/AM/TemplateRedirect.cfm?template=/CM/ContentDisplay.cfm&ContentID=56830 (last visited Aug. 25, 2009) (indicating that 96,678 Chapter 7 cases were filed in California alone). However, it is a rule of long standing that federal courts may not issue advisory opinions. *See Muskrat v. United States*, 219 U.S. 346, 352-

B

We start with section 521(a)(2). Dumont asserts that the retention of "if applicable" in that section demonstrates the continuing existence of ride-through. Because Congress would have known that this court (and the Fourth Circuit) relied on this phrase to establish ride-through, Dumont argues, it would have eliminated the phrase had it intended to eliminate ride-through. This argument is not without some force. Yet, were we to accept Dumont's view, the amendments to the savings clause and its reference to section 362(h)[15] simply have no effect. We cannot rely solely on *Parker* and write the 2005 amendments out of the Bankruptcy Code.

[5] A core underpinning of *Parker*—"that the only mandatory act is the filing of the statement of intention," 139 F.3d at 673—is inconsistent with the amendments, which clearly provide that the debtor shall not only file a statement of intention but also follow through with his expressed intent. 11 U.S.C. § 362(h). Another pillar of its holding was that the savings clause indicated "unambiguously" that section 521(a)(2) did not alter the debtor's rights with regard to the collateral. 139 F.3d at 673. With the addition of an exception for section 362(h), this conclusion is not only obsolete but actively contradicted. The inclusion of the exception strongly implies that section 362(h) can, in fact, alter the debtor's rights with regard to the collateral.

---

60 (1911) (recounting the origins of the rule, which date back to 1792). We note that, in an appropriate case dealing with this issue, scheduling priority may be appropriate because of the significant impact of ride-through on Chapter 7 bankruptcy practice. *See* 9th Cir. R. 27-12; 9th Cir. Gen. Order 3.3(g).

[15]"[N]othing in subparagraphs (A) and (B) of this [§ 521(a)(2)] shall alter the debtor's or the trustee's rights with regard to such property under this title, *except as provided in section 362(h)*[.]" 11 U.S.C. § 521(a)(2)(C) (emphasis added).

**[6]** We now turn to that section to see if Dumont's rights were altered. As earlier noted, in this circuit the only duty imposed by pre-BAPCPA law was to file the notice of intention. A specification of intent to redeem or reaffirm need only have been communicated "if applicable"—that is, if the debtor chose one of those options. *Parker*, 139 F.3d at 673. Section 362(h)(1)(A) makes clear that the debtor now has two duties with respect to the statement of intention. As before, the debtor must "file timely any statement of intention required under section 521(a)(2)." *Id.* But now, he must "indicate in such statement that" he will do one of four things: surrender, redeem, reaffirm, or assume an unexpired lease. *Id.* To be specific, he must indicate "either" surrender "or" retention; if he chooses the latter, he must indicate "either" redemption, reaffirmation, "or" assumption. *Id.* "Either" means "[t]he one or the other." American Heritage Dictionary of the English Language 572 (4th ed. 2000). Although traditionally it has referred to only two items, the standards of the English language have degenerated such that either is now acceptable with more than two clauses. *See id.* at 572-73 (usage note). However, the "either . . . or" disjunction has always meant that one of the listed alternatives must be satisfied.[16]

**[7]** Thus, while Dumont filed a statement of intention, and properly stated that she intended to retain the property, she failed to indicate one of the three permissible means of doing so. Accordingly, the automatic stay was terminated with respect to her automobile. Furthermore, the automobile was no longer the property of the estate.

We pause to note an exception to section 362(h). A debtor who files an intent to reaffirm on the original contract terms but is unable to complete such a reaffirmation due to the creditor's refusal is not subject to the section.[17] Ride-through is

---

[16]For instance, if a person states he will do either A or B, he has not complied with his statement if he instead does C (even if A, B, and C are in the same class of actions).

[17]*See* 11 U.S.C. § 362(h)(B) (requiring the debtor "to take timely the action specified in such statement, . . . *unless such statement specifies the*

functionally indistinguishable from reaffirmation on the original terms except for the lack of personal liability in the former. The careful carve-out of reaffirmation on the contract terms—a return to the status quo ante bankruptcy—implies that debtors who attempt to ride-through are subject to section 362(h). If ride-through existed, any lawyer who advised his client to make a reaffirmation offer on the original contract terms would be guilty of malpractice, and any bankruptcy judge who approved such a reaffirmation from a pro se litigant would be seriously derelict in his duties. For why would one ever choose reaffirmation on such terms and thus incur the risk of personal liability when one could safely achieve the same ends by ride-through? Yet Congress clearly contemplated that offers of reaffirmation on the original terms would be made. If the debtor qualifies for the exception, then it seems that the result would be the same as pre-BAPCPA ride-through. Congress presumably would not have created an "exception" to provide access to an option all debtors had in the first place. If all debtors had the right to elect ride-through in the first instance, the exception would be wholly devoid of content. The traditional rules of statutory construction counsel against that result. This supports a conclusion that ride-through is not available to all.

C

**[8]** The mere termination of the automatic stay, however, was not enough to authorize Ford's repossession. As *Butner* teaches, the disposition of the debtor's assets is generally left to state law. 440 U.S. at 54-57. Nothing in the Code itself authorized Ford to repossess Dumont's automobile. The removal of the automatic stay merely lifted one obstacle to its doing so.

---

*debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree.*" (emphasis added)).

The parties' contract, in conjunction with state law, determines when a debtor has defaulted on an automobile loan. There is an important caveat, however: 11 U.S.C. § 365(e)(i)(B) generally renders unenforceable any contractual term which purports to create a default solely based on the commencement of a bankruptcy case. Dumont's loan contained an ipso facto clause, but unless section 365(e) is trumped Ford cannot rely on the clause to justify its actions.

The bankruptcy court and the BAP found that section 521(d) provided just the trump Ford needed. Because Dumont failed to take action required by section 362(h), "nothing in [the Code] prevent[ed] or limit[ed] the operation of a provision in the underlying lease or agreement that has the effect of placing the debtor in default under such lease or agreement by reason of the occurrence, pendency, or existence of a proceeding under this title or the insolvency of the debtor." *Id.* § 521(d).

Section 521(d) gives Ford no substantive right to take action against the collateral. Where there is no ispo facto clause in the contract, it does not allow Ford to pencil one in. *Steinhaus*, 349 B.R. at 710. Rather it removes the last remaining impediment under federal bankruptcy law to enforcement of an ipso facto clause that already exists.[18]

[9] Dumont asserts that while section 521(d) may place the debtor in default, it "does not provide any recourse or other action against the Debtor or Debtor's property." It "has the effect of placing the debtor in default, nothing more. A debtor is simply deemed to be in default." Unfortunately for

_____

[18]Although neither party discusses it in any detail, 11 U.S.C. § 541(c)(i)(B) also restricts ipso facto clauses, declaring that at the time of filing the debtor's property becomes property of the estate notwithstanding a contract provision "that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." But section 362(h) had already divested Dumont's automobile of its previous status as property of the estate.

Dumont, the consequences of default are determined by the contract and state law.[19] Dumont's default did not give Ford a right to repossess her vehicle by itself, but section 521(d) did give Ford the rights it possessed under the contract in the event of default because of Dumont's filing for bankruptcy. Ford reserved the right to take the collateral back in case of a default. Once Dumont failed to take the action required by section 362(h), federal bankruptcy law no longer prevented Ford from repossessing her car.

## D

Dumont next claims that section 521(d) is inapplicable because she was never engaged in a bankruptcy "proceeding"[20] but only a bankruptcy "case."[21] This argument was not pres-

---

[19]Dumont argues that had Congress intended for a default to mean anything, it would have provided (as it did in section 521(a)(6)) that "the creditor may take whatever action as is permitted by applicable nonbankruptcy law." We reject this argument. When Congress has said something clearly once in a statute, it need not do so again. Congress well knew what placing a debtor in default meant and what actions it might authorize the creditor to take (depending on the contract terms and state law). Furthermore, Congress also indicated its understanding of what would happen to debtors in Dumont's shoes when it passed the provision of section 362(h) which divests the property from the estate.

As an alternative, Dumont mentions the possibility of "recourse outside the Debtor or her property." As an example of such "recourse," she asserts that a default may lead to changes in the creditor's financial statements or might trigger a default swap agreement. But the clear purpose of the BAP-CPA amendments is to compel certain action from the debtor, and sections 362(h) and 521(d) are spurs to compliance.

[20]See 11 U.S.C. § 521(d) (providing that "nothing in [the Bankruptcy Code] shall prevent or limit the operation of a provision [creating a default under the contract] . . . by reason of the occurrence, pendency, or existence of a *proceeding* under this title or the insolvency of the debtor" (emphasis added)).

[21]"In basic bankruptcy terminology, a bankruptcy proceeding is not the same as a bankruptcy case. A proceeding is something that occurs within an already existing bankruptcy case." *Donald*, 343 B.R. at 538.

ented to the bankruptcy court. The BAP did not consider it, although she did address it in the opening brief before the BAP. We conclude, however, that Dumont's argument falls within one of the exceptions to the waiver doctrine. "When the issue conceded or neglected in the trial court is purely one of law and either does not affect or rely upon the factual record developed by the parties . . . the court of appeals may consent to consider it." *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978) (internal citations omitted). The opposing party must not be prejudiced before the court may consent. *Id.* Satisfied that the question is purely one of law and that Ford was not prejudiced by its absence below, we exercise our discretion to consider the question.[22] In the years since BAPCPA came into force, no court of appeals has had the opportunity to pass on the viability of ride-through, and because of the low amounts of money at stake it may be some time before the issue here presents itself again to this court. Because the parties have a strong interest in the resolution of this question and because it was adequately briefed by both sides, we decide it now.

**[10]** We agree with the *Donald* court that "the language of § 521(d) is broad enough to encompass the filing of a bankruptcy case." *Donald*, 343 B.R. at 538. We acknowledge that Congress has referred to "case[s] or proceeding[s]" elsewhere in the Code. *See, e.g.*, 11 U.S.C. 101(4)(A) (defining "bankruptcy assistance" subject to regulation elsewhere in the Code). We also agree that the specialized meaning of the term "proceeding" supports Dumont's assertion. However, "proceeding" also has a more general definition which easily encompasses the filing of a bankruptcy case. *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1398 (4th ed. 2000) (defining proceeding as a "course of action" or "a pro-

---

[22]We decline, however, Dumont's invitation to interpret the term "proceeding" in her contract with Ford. The interpretation of ambiguous contracts may involve questions of fact as well as law. Fact-finding is not a proper task for Dumont to ask of us.

cedure" or (in a legal context) "legal action" or "litigation"). While Black's Law Dictionary acknowledges the bankruptcy-specific meaning, the lead definition is "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." BLACK'S LAW DICTIONARY 1241 (8th ed. 1999).

Accordingly, the reference to a "proceeding" is ambiguous. We turn to the traditional sources to clarify ambiguous legislative text. The familiar canon of construction, *noscitur a sociis*, counsels us to determine the meaning of the term "proceeding" by reference to the alternate condition for default, "insolvency." Insolvency (i.e., in the sense of inability to pay "debts as such debts become due,") is generally required for the initiation of a bankruptcy case. *See* 11 U.S.C. § 303(h)(1). And likewise debtors do not generally file for bankruptcy unless they are insolvent. On the other hand, the filing of a bankruptcy proceeding (say, seeking discharge of student loan debt) has nothing to do with insolvency. It merely marks a changed procedural posture in a case involving an already insolvent debtor.[23]

**[11]** Reading "proceeding" as encompassing the filing of a case makes sense of the statute. It would be bizarre if the right to declare someone in default on her car loan depended on the happenstance of a proceeding (in the technical sense) being initiated for whatever reason in her case. Because there is no plain meaning, we need not decide whether the absurdity exception would apply here.[24]

---

[23]The relevant committee report also militates against Dumont's position. It states: "If the debtor fails to timely undertake certain specified actions . . . then nothing in the Bankruptcy Code shall prevent or limit the operation of a provision in a lease or agreement that places the debtor in default by reason of the debtor's *bankruptcy* or insolvency." H.R. Rep. No. 109-31(I), pt. 2, at 71 (2005) (emphasis added).

[24]We do note that Dumont's preferred reading would have mischievous results for other parts of the Code. For instance, she cites 11 U.S.C.

**[12]** Finally, we consider how section 521(d) works together with other sections of the Code. The section is invoked by the debtor's failure to do certain things he is required to do, either under section 521(a)(6) or under section 362(h). Neither those sections of the Code nor the apparent purpose of section 521(d) bear any relationship to the organization of litigation in a bankruptcy case. Accordingly, we hold that the debtor's filing of a Chapter 7 petition initiates a "proceeding" for the purposes of section 521(d).

E

Dumont argues that a disclosure required to be made to consumers who are contemplating reaffirmation demonstrates that ride-through lives on. The relevant paragraph of the disclosure reads:

> What if your creditor has a security interest or lien? Your bankruptcy discharge does not eliminate any lien on your property. A 'lien' is often referred to as a security interest, deed of trust, mortgage or security deed. *Even if you do not reaffirm and your personal liability on the debt is discharged, because of the lien your creditor may still have the right to take the security property if you do not pay the debt or default on it.* If the lien is on an item of personal property that is exempt under your State's law or that the trustee has abandoned, you may be able to

---

§ 541(c) for the proposition that Congress knows the technical meaning of the word "case." Yet if Congress intended for "proceeding" and "case" to have only their technical meanings, section 541(c) would not prevent the action of ipso facto clauses which hinge on the institution of a "proceeding" rather than a "case." Similar problems occur with section 365(e), which is the source of the restriction on ipso facto clauses in executory contracts. Although that section disables ipso facto clauses predicated on the filing of a "case," it does not bar the activation of clauses based on "proceedings."

redeem the item rather than reaffirm the debt. To redeem, you make a single payment to the creditor equal to the current value of the security property, as agreed by the parties or determined by the court.

11 U.S.C. § 524(k)(3)(J)(i) (emphasis added).

**[13]** The language is certainly more opaque than one would hope for a debtor disclosure. It is simply too vague to support the weight Dumont would have us place upon it. Taken literally, the italicized sentence merely states the obvious: filing for bankruptcy does not affect the creditor's rights in the collateral, and the creditor can exercise its power of repossession under the contract in case of non-payment or default. Allowing the creditor to exercise a clause placing the debtor in default is not inconsistent with this truism. Furthermore, the language "pay the debt" is ambiguous. It could, as Dumont asserts, mean "continue to make monthly payments as under the contract."[25] But it could also mean "pay off the debt" (i.e., redeem it). This latter reading is supported by the very next sentence, which offers redemption as the alternative to reaffirmation if the collateral is exempt under state law or has been abandoned by the trustee.

**[14]** Tellingly, nowhere in the disclosure is ride-through presented as an option. Given that the disclosure describes redemption as an alternative to reaffirmation, the absence of a similar description of ride-through suggests that it is not authorized in the presence of an ipso facto clause. Because the intent of the disclosure is to force debtors to "[c]onsider the decision to reaffirm carefully," 11 U.S.C. § 524(k)(3)(J)(i), we decline to read one ambiguous sentence as an endorsement of ride-through where Congress provided explicit information

---

[25]This reading is uncontroversial where there is no ipso facto clause in the contract. Accordingly, even if Dumont is correct about the interpretation of the disclosure, it could refer only to the default rule that bankruptcy cannot lead to repossession.

about the statutorily authorized alternative to reaffirmation, redemption.

## F

Having decided that section 521(a)(2)(C), in conjunction with section 362(h), disallows ride-through, we need not consider whether ride-through may also have been terminated under the provisions of section 521(a)(6).[26] We merely note that the existence of section 521(a)(6) provides further evidence of Congress's intent to eliminate—or at least to restrict —ride-through.[27]

## IV

[15] Dumont makes one remaining argument. She asserts that her claim that the repossession was unlawful under state law is a matter to be determined by the bankruptcy court. As

[26]We have chosen to resolve this case without resort to section 521(a)(6) because of the difficulties of construing the term "for the purchase price." We express no opinion on the BAP's conclusion that section 521(a)(6) independently eliminates ride-through in this case. *Compare Dumont*, 383 B.R. at 488 (construing "purchase price" to mean "purchase money security interest" because "[o]therwise the section would probably be meaningless and have virtually no application because few automobile lenders finance cars without some form of down payment, and any amount of down payment would reduce the creditor's claim to an amount less than the purchase price"); *Steinhaus*, 349 B.R. at 706-07 (same result), *with Donald*, 343 B.R. at 536 ("A plain meaning construction of the term 'claim for the purchase price' indicates a claim for the *full purchase price*."); *id.* at n.9 (observing that the legislative history is not the final arbiter of the text's meaning, particularly where the legislative history for the same subsection is clearly incorrect on another point).

[27]This is clearer in the legislative history than in the text itself; the former states that the new language "provide[s] that an individual who is a chapter 7 debtor may not retain possession of personal property securing, in whole or in part, a purchase money security interest unless the debtor, within 45 days after the first meeting of creditors, enters into a reaffirmation agreement with the creditor, or redeems the property." H.R. Rep. No. 109-31(I), pt. 2, at 70-71 (2005).

the BAP stated, "In the Ninth Circuit the test to determine whether a civil proceeding is related to a bankruptcy case is whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Dumont*, 383 B.R. at 490 (internal quotation marks omitted). By the time of the repossession, the estate did not exist, and there could have been no effects on the estate.

Dumont also argues that there was supplemental jurisdiction over the state-law claim. However, she only asserted 28 U.S.C. §§ 1331 and 1334 as bases for jurisdiction before the bankruptcy court. Her assertion of a different jurisdictional theory here is barred by the doctrine of waiver.[28]

V

[16] At least where the debtor has not attempted to reaffirm, our decision in *Parker* has been superceded by BAP-CPA. Accordingly, Ford did not violate the discharge injunction in repossessing Dumont's vehicle. The bankruptcy court rightly held that the propriety of Ford's actions under state law was not before it.

**AFFIRMED.**

---

[28]We hasten to note that Dumont and debtors in her position are not necessarily bereft of a remedy. "Both Dumont's and Ford's rights and remedies under the[ir] [c]ontract are defined and brought into existence by their [c]ontract and are now governed by state law." *Dumont*, 383 B.R. at 490. While we tend to view Ford's actions here as sharp practice, we express no opinion as to whether they also violated any state or non-bankruptcy federal laws.

GRABER, Circuit Judge, dissenting:

I respectfully dissent.

May a bankruptcy debtor "ride through" bankruptcy—retaining possession of her motor vehicle, so long as she continues to make regular loan payments; or must the debtor instead invoke one of the three options described in 11 U.S.C. § 521(a)(2)(A)? Because of confusing and contradictory statutory text, courts have struggled for decades to discern congressional intent on the answer to that simple question. Indeed, before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the circuit courts were split five to four. Five circuits—including ours—had held that the ride-through option was available to debtors, while four circuits had held that it was not. *See* maj. op. at 13412 & nn. 5-6 (collecting cases). The disagreement at the circuit court level represented only the tip of the iceberg. In scores of cases, district courts, bankruptcy appellate panels, and bankruptcy courts had weighed in on the debate,[1] as had commentators.[2]

---

[1]*See, e.g.*, *Mayton v. Sears, Roebuck & Co. (In re Mayton)*, 208 B.R. 61, 64 (B.A.P. 9th Cir. 1997) (resolving the ride-through issue while noting the "marked disagreement among bankruptcy courts and district courts"); *Sears Roebuck & Co. v. Lamirande*, 199 B.R. 221, 223 (Bankr. D. Mass. 1996) (noting that "[c]ourts across the country have split" on the ride-through issue and, in the absence of binding precedent, adopting the more persuasive position); *In re Kennedy*, 137 B.R. 302, 303-04 (Bankr. E.D. Ark. 1992) (noting that "[n]umerous bankruptcy courts . . . have ruled on this issue[ ] with little consistency in results" and, because "[t]here is no controlling authority in this district," adopting the "more persuasive" position).

[2]*See, e.g.*, 4 *Collier on Bankruptcy* ¶ 521.10 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (advancing the Ninth Circuit's view and criticizing the opposing view's reading of the statute); Scott B. Ehrlich, *The Fourth Option of Section 521(2)(A)—Reaffirmation Agreements and the Chapter 7 Consumer Debtor*, 53 Mercer L. Rev. 613, 700 (2002) (asserting that the ride-through issue "affects billions of dollars in assets and has great importance for both debtors and creditors"); Marianne B.

The dispute centered on the text of 11 U.S.C. § 521(2) (2004), which BAPCPA redesignated as § 521(a)(2). Like many courts and commentators, we held that the text of § 521(2) plainly authorized the ride-through option. *McClellan Fed. Credit Union v. Parker (In re Parker)*, 139 F.3d 668, 673 (9th Cir. 1998); *see also Home Owners Funding Corp. of Am. v. Belanger (In re Belanger)*, 962 F.2d 345 (4th Cir. 1992) (reaching the same conclusion); 4 *Collier on Bankruptcy* ¶ 521.10 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (same). Other courts held that the text of § 521(2) plainly directed the opposite conclusion: Debtors must choose one of the three options listed in § 521(2)(A).[3] *See, e.g.*, *Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512, 1517 (11th Cir. 1993).

Our analysis in *In re Parker*, like the analysis provided by other courts and commentators, concerned two aspects of the text of § 521(2): the phrase "if applicable" in § 521(2)(A) and the text of § 521(2)(C). We reasoned in *In re Parker*:

> The statute states that the debtor

---

Culhane & Michaela M. White, *But Can She Keep the Car? Some Thoughts on Collateral Retention in Consumer Chapter 7 Cases,* 7 Fordham J. Corp. & Fin. L. 471, 498 (2002) (arguing that "[b]oth debtors and creditors would be better served by recognizing a debtor's right to ride-through on some collateral"); Lawrence Ponoroff, *Surf's Up, Dude: Riding Through Bankruptcy*, 7 J. Bankr. L. & Prac. 101, 101-02 (1997) (noting the "decided and disturbing lack of consensus" among courts and discussing the National Bankruptcy Review Commission's review of the ride-through issue); Ned W. Waxman, *Redemption or Reaffirmation: The Debtor's Exclusive Means of Retaining Possession of Collateral in Chapter 7*, 56 U. Pitt. L. Rev. 187, 187 (1994) (stating that the ride-through issue is "[t]he most controversial consumer credit issue arising in [bankruptcy] cases").

[3]Other courts looked beyond the text, to policy considerations. *See Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 367-68 (3d Cir. 2004) (summarizing cases).

shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that the property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property.

11 U.S.C. § 521(2)(A). Our interpretation of that language is that the only mandatory act is the filing of the statement of intention, which the debtor "shall" file. Then, "if applicable,"—that is, if the debtor plans to choose any of the three options listed later in the statute (claiming the property as exempt, redeeming the property, or reaffirming the debt)— the debtor must so specify in the statement of intention. The debtor's other options remain available, as unambiguously stated in § 521(2)(C): "[N]othing in subparagraph[ ] (A) . . . shall alter the debtor's or the trustee's rights with regard to such property under this title." We see no reason to reach beyond this plain language.

139 F.3d at 673 (alterations in original) (paragraph break omitted).

As explained by *In re Belanger*, "[t]he phrase 'if applicable' is redundant if . . . the options given to the debtor are considered to be exclusive." 962 F.2d at 348. And, of course, courts should give effect, if possible, to every word in a statute. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). The Fourth Circuit suggested simple alternative text that Congress could have used if the options were exclusive, *In re Belanger*, 962 F.2d at 348—a suggestion that was repeated 12 years later by the Third Circuit in *In re Price*, 370 F.3d at 371.

Against this backdrop, Congress enacted BAPCPA in 2005. The majority begins with the "assum[ption] that Congress

intended to make ride-through available in all circuits, or none." Maj. op. at 13418. I am not convinced. The legislative history is *completely silent* on the issue, with nary a reference to the vigorous public debate by the courts and commentators. In my view, the changes to the text indicate an intent to *perpetuate* the extant circuit split, not *resolve* it.

Most importantly, § 521(a)(2)(A) remains entirely unchanged. The all-important "if applicable" phrase—the very source of disagreement among circuit courts, district courts, bankruptcy courts, and commentators—remains intact. Congress not only declined to adopt the Fourth Circuit's suggested text, it declined to make any change whatsoever.

I acknowledge, of course, that Congress did modify § 521(a)(2)(C) to include an exception for new § 362(h). But my examination of that section suggests that, if anything, Congress intended *no change* to the existing circuit split. The new section requires, in relevant part, that the debtor must

> indicate in such statement [of intention] that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, *as applicable*[.]

11 U.S.C. § 362(h)(1) (emphasis added). The text of § 362(h) thus parallels the text of § 521(a)(2)(A) in that it requires the debtor to follow one of three options "if applicable," § 521(a)(2)(A), or "as applicable," § 362(h)(1).[4]

---

[4]I tend to agree with Ford that the phrase "as applicable"—if read in isolation—more strongly suggests that one of the three options must be selected. Given the context of the BAPCPA amendments, the long-

When faced with confusing and contradictory amendments to already confusing and contradictory statutory text,[5] what should we do? The majority reasonably starts from a presumption that Congress must have intended to resolve the circuit split and the more general principle that Congress intended uniformity in the bankruptcy laws. As explained above, though, I am not convinced that those presumptions apply here. In the context of this case, I would fall back on two different—and equally relevant—presumptions guiding statutory interpretation.

First, as a general matter, " 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.' " *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2492 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)). As noted above, the differing judicial interpretations were well known and were encapsulated in the five-four circuit split. Yet Congress did not amend § 521(a)(2)(A) or the critical phrase "if applicable," even though courts and commentators across the nation had provided different interpretations of that section. Additionally, although Congress amended § 521(a)(2)(C) to include the new § 362(h), it carried forward the important qualifier "applicable." "[A]bsent a *clear expression* elsewhere in the Amendments of Congress' intent to repeal some portion of that provision or to abrogate [the circuit split]," *Forest Grove*, 129 S. Ct. at 2492 (emphasis added), we should continue to read the statute as we did pre-BAPCPA. As I read the BAPCPA amendments, no such "clear expression" emerges.

---

standing jurisprudence and commentary on the ride-through option, and the interplay between § 521 and § 362, however, I decline to assign much weight to the potential distinction between "if applicable" and "as applicable." The phrase "as applicable" is not so rigid as to command that one of the listed options *must* be followed.

[5]The majority readily acknowledges the confusing nature of the amendments. Maj. op. at 13415 & n.11.

I pause to note that I do not disagree with the majority that the general "direction and tenor of the changes . . . suggest that Congress did not intend to increase access to ride-through by passing BAPCPA." Maj. op. at 13418. But the general "direction and tenor" of a statutory amendment is not the correct inquiry. The correct inquiry is congressional intent with respect to the specific issue. Furthermore, I readily agree that "Congress did not intend to increase access to ride-through by passing BAPCPA." In my view, though, Congress decided to do nothing—neither increasing nor decreasing access to ride-through. Rather, Congress simply side-stepped the contentious ride-through issue, thus perpetuating the circuit split.

Second, specific to the Bankruptcy Code, the overarching guiding principle of statutory interpretation, "again and again emphasized by the courts," *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934), strongly supports my view: "The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor," *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (internal quotation marks omitted). Here, Dumont filed for bankruptcy, stated her intent to retain the car as a ride-through, and declined Ford's request to reaffirm the debt. Ford filed a claim with the bankruptcy court but, so far as the record reveals, never objected to Dumont's statement of intent or her rejection of the offer of reaffirmation. The bankruptcy case proceeded in the normal course, and the bankruptcy court issued an order of discharge. At all times—both during the bankruptcy proceedings and after the discharge order—Dumont continued to make her regularly scheduled loan payments to Ford. Months after the discharge and without any notice to Dumont, Ford repossessed Dumont's car. As can be imagined, Dumont claims that the repossession of her only means of transportation, without any notice whatsoever, caused her great difficulties.[6] It is hard—if not impossible—to reconcile Ford's actions with

---

[6]As courts have noted, a debtor's personal automobile is often "vital" to the debtor (and the estate) because, for example, the "automobile [is]

the principal purpose of the Bankruptcy Code: to give Dumont a "fresh start." In the absence of a clear congressional intent approving Ford's actions, I would not read such an intent into the statute.

In conclusion, I borrow text, equally applicable here, from my colleagues in a recent bankruptcy appeal concerning a different perplexing provision:

> The "correct" answer to the question before us, which the courts have been struggling with for years —at the unnecessary cost of thousands of hours of valuable judicial time—depends ultimately not upon our interpretation of the statute, but upon what Congress wants the answer to be. We would hope, in this regard, that we the judiciary would be relieved of this Sisyphean adventure by legislation clearly answering a straightforward policy question: [May debtors invoke the "ride-through" option?]

*Ransom v. MBNA, Am. Bank, N.A. (In re Ransom)*, No. 08-15066, 2009 WL 2477609, at *6 (9th Cir. Aug. 14, 2009). In contrast to the situation in *In re Ransom*, we have already answered the question at hand. *In re Parker*, 370 F.3d at 371. Because the BAPCPA amendments add only confusion, I would not overrule *In re Parker*.

---

used to commute to one's workplace." *In re Price*, 370 F.3d at 378 n.10. Additionally, a debtor's financial situation and access to financing for a new vehicle during—or, as here, immediately following—bankruptcy is generally limited, because she recently has filed for bankruptcy. *Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 52 (2d Cir. 1997).